Neil H. ROBBLEE
*v.*
DEPARTMENT OF REVENUE
*and*
George MAITLAND
*and*
Peter MORKILL
(TC 3700)

George B. MAITLAND
*v.*
DEPARTMENT OF REVENUE
*and*
Neil H. ROBBLEE
*and*
Cary GARMAN
(TC 3701)

Cary L. GARMAN
*v.*
DEPARTMENT OF REVENUE
(TC 3702)

Plaintiff Neil H. Robblee appeared *pro se*.

Plaintiff Cary L. Garman appeared *pro se*.

John Eric Wilkes and William L. Ghiorso, Callaghan & Wilkes, Salem, represented plaintiff George B. Maitland and defendant Peter Morkill.

James C. Wallace, Assistant Attorney General, Department of Justice, Salem, represented defendant (department).

Decision for defendants rendered May 16, 1996.

**CARL N. BYERS, Judge.**

These matters, which have been consolidated for trial, concern the personal liability of four corporate officers for unpaid withholding taxes for the fourth quarter of 1989. When the corporation became bankrupt and the taxes remained uncollected, the Department of Revenue (department) assessed the officers of the corporation. The officers raised a number of defenses, including the defense that their ability to perform their duties under ORS 316.167[1] was excused because a lender controlled the corporation's finances.

## FACTS

George Maitland (Maitland) and Peter Morkill (Morkill), furniture manufacturers, became acquainted with Neil Robblee (Robblee), an attorney, through Cary Garman (Garman), a certified public accountant and business broker. In late 1988, the four agreed to purchase the assets and inventory of the furniture division of Harris Pine Mills Inc., a large manufacturing concern then in bankruptcy. Pooling their resources and talents, they organized a new corporation, Harris of Pendleton, Inc. (HOPI). On January 27, 1989, HOPI purchased the assets and inventory of Harris Pine Mills for approximately $8 million.

The financial circumstances of the venture were precarious from the beginning. The principals contributed $600,000 in equity. Their contributions and stock ownerships were as follows:

---

[1] All references to the Oregon Revised Statutes are to the 1989 Replacement Part.

| NAME | CONTRIBUTIONS | % STOCK OWNERSHIP |
|---|---|---|
| Neil H. Robblee | $50,000 Cash | 51% |
| | $200,000 Letter of Credit | |
| Cary L. Garman | $50,000 Cash | 5% |
| George Maitland | Furniture Business | 35% |
| Peter Morkill | Valued at $300,000 | 9% |

The organization of the corporation was as follows:

## Board of Directors
Neil Robblee
Jeannie Robblee

## Officers
Chief Executive Officer (CEO) - Neil Robblee
President - George Maitland
Secretary - Jeannie Robblee
Chief Financial Officer - Cary Garman
Vice President - Peter Morkill

Because HOPI needed to borrow most of the purchase price, the principals arranged for financing through Congress Financial Corporation (CFC). CFC loaned HOPI $1.5 million to purchase the equipment and extended a line of credit of up to $3.5 million based upon and secured by HOPI's accounts receivable and inventory. The balance of the purchase price was provided by a note and second mortgage taken back by the owner of Harris Pine Mills.

The business did not prosper as anticipated. HOPI's sales of older inventory netted less and modernization of equipment cost more than expected. Further, a misunderstanding with CFC resulted in less working capital at a time when the need for working capital increased. By the latter half of 1989, the business was struggling and tensions were increasing. On September 1, 1989, Robblee, as CEO, signed a loan modification agreement with CFC, which some of the other officers viewed as being very detrimental. Among other things, the agreement provided that the maximum credit

available against HOPI's inventory would be reduced by $300,000. This reduction was to be phased in by December 31, 1989.

About the same time, the parties began to anticipate problems in paying the payroll taxes. HOPI's net payroll averaged $200,000 to $225,000 every two weeks, with withholding taxes constituting another 25 to 30 percent. On September 26, 1989, Maitland, who had some past experience with unpaid payroll taxes, asked Robblee to have his name removed from the bank's signature cards.

In early October 1989, HOPI began exceeding its credit limits, which were now less than the original loan limits. Although CFC advanced funds in excess of the loan limits, CFC was now more concerned and considered HOPI's bills on a daily basis. On October 9, 1989, HOPI made its last state withholding payment prior to its bankruptcy in December 1989. By letter dated October 12, 1989, Morkill withdrew his authority to sign checks. Although HOPI was current in its withholding at this point, it was apparent that within a few days it would be delinquent. All of its officers, except the secretary Jeannie Robblee, participated in a mid-October meeting where they discussed unpaid withholding taxes and HOPI's financial circumstances. Robblee testified that the consensus of the group was to try to work with CFC to solve HOPI's financial problems. The other officers dispute this and contend that Robblee alone made the decision. However, if there was not a consensus, there was at least acquiescence.

In November 1989, HOPI missed both its federal and state withholding payments. At that point, it was still negotiating with CFC for increased credit. During this time, Garman testified that he could obtain advances from CFC only for specific bills, and CFC refused to fund the payment of withholding taxes.

Due to a blocked depository arrangement, CFC had a stranglehold on HOPI, receiving all revenue from HOPI's operations and making loan advances only for approved expenses. By December 1, 1989, Robblee, Maitland, and Garman concluded that CFC was just leading them on and would not increase their credit limit. They decided to stop cooperating with CFC. Garman was to continue to apply for loan

advances to pay vendors approved by CFC, but they would use the money to pay withholding taxes. The officers managed to make two payments on HOPI's federal withholding tax obligations before CFC ceased all loan advances. Around the same time, Robblee and Garman tried to obtain some leverage with CFC by holding daily deposits in HOPI's vault, rather than depostitng the money in CFC's bank account pursuant to the loan agreement. This increased CFC's distrust and it obtained a temporary restraining order prohibiting HOPI from holding the deposits. On December 18, 1989, HOPI filed a petition in bankruptcy.

ORS 316.167 requires every employer to withhold a determined amount from wages paid. The employer is required to prepare and file quarterly tax returns. ORS 316.168. Payment of the taxes withheld generally follows the federal time schedule. ORS 316.197. ORS 316.207 expressly provides that withheld taxes are held by the employer "in trust for the State of Oregon." The statutes impose personal liability on individuals in charge of a corporation by including them in the definition of an "employer."

> "An officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee or member is under a duty to perform the acts required of employers by ORS 316.167, 316.182, 316.197, 316.202 and 316.207." ORS 316.162(3)(b).

## ISSUES

(1) Did the actions of CFC excuse the officers from their liability under ORS 316.167? (2) If the officers were not excused, which of the officers are individually liable under the statute?

## COURT'S ANALYSIS

■ The officers claim they are not liable because CFC controlled corporate expenditures and prevented them from paying the withholding taxes. In making this argument the officers rely primarily upon federal cases interpreting the federal statute. While this is reasonable because the state statute is patterned after the federal statute, it is essential to remember the federal statute requires willfulness, an element not required by the state. *See Olson v. Dept. of Rev.*, 10

OTR 272 (1986), *rev'd on other grounds* 304 Or 241, 744 P2d 240 (1987).

■ ORS 316.167(1) imposes a duty on the employer to withhold taxes. From the text and context of the statute, no amount of control by a lender relieves the employer of that duty. The mandatory "shall" admits no excuse. The statutory scheme assumes the duty will be performed and credits the employee for the amount withheld. ORS 316.187. Nothing in the statute suggests that an employer may be excused from its withholding obligations.

■ A lender extending credit or advancing funds to an employer for payroll purposes, knowing that the employer can not or does not intend to pay withholding taxes, also becomes liable for those same withholding taxes. ORS 316.167(3). However, the lender provision merely enlarges the scope of liability for unpaid withholding taxes. It acts to relieve an employer of liability only to the extent an amount is actually paid by a lender. ORS 316.167(3).

■ ORS 316.162(3), by definition, imposes the employer's fiduciary duty on corporate officers who are responsible for seeing that the corporation performs its duty to pay withholding taxes. The statute makes the officers personally liable if that duty is not performed. Accordingly, no control by a lender will relieve corporate officers of that duty or their personal liability if the duty is not performed.

■ Even federal courts recognize there must be limits on the excuses acceptable under the federal statute, otherwise the law loses its effectiveness. Federal courts have held that corporate officers may not escape liability by entering into agreements that give lenders the power to determine which creditors shall be paid. *See, e.g., Kalb v. U.S.*, 505 F2d 506, 74-2 USTC (CCH) ¶ 9760 (2d Cir 1974). However, citing *Alsheskie* and *Vaccarella*, Robblee argues that this rule applies only to situations where officers lose control after the tax obligation arises. *See Alsheskie v. U.S.*, 31 F3d 837, 94-2 USTC (CCH) ¶ 50,387 (9th Cir) (1994) and *U.S. v. Vaccarella*, 735 Fed Sup 1421, 90-1 USTC (CCH) ¶ 50,305 (1990). Both of these cases are distinguishable on their facts. More important, due to the willfulness element, federal cases in general are neither binding nor particularly persuasive.

In *Bradshaw v. U.S.*, 71 F3d 1517, 96-1 USTC (CCH) ¶ 50,028 (10th Cir 1995), the court found the corporate officer liable even though he had lost control before the tax liabilities arose. The court noted that the taxpayer's lack of power was a direct result of an agreement he had voluntarily made. The court's opinion suggests that "[w]hen the Bank refused Bradshaw's request to pay the taxes, Bradshaw could have resigned his position with HBP or refused to sign any checks and shut down the business." *Id.*, 71 F3d at 1523. Another option for a corporate officer would be to prorate the money obtained from the lender between the payroll and the withholding taxes to make sure that payroll taxes are paid. *See, e.g., Hochstein v. U.S.*, 900 F2d 543, 90-1 USTC (CCH) ¶ 50,205 (2d Cir 1990).

Even if lender control could excuse an officer from personal liability, the evidence regarding CFC's control is less than conclusive. Garman testified that CFC refused to advance funds to pay withholding taxes. The agent for CFC testified that he never refused to advance funds for the withholding taxes. Instead, he stated that the funds advanced were under HOPI's control. He also testified that he told Garman the withholding taxes had to be paid as required by the written loan agreement. Garman admitted he believed the best interests of the corporation and his instructions were to keep CFC happy and to do whatever it wanted.

The officers were in control. The best evidence of that fact is their decision to pay federal withholding taxes rather than vendors. Although this may have had the effect of disrupting HOPI's line of credit with CFC and ending business operations, it was a duty they were personally liable to perform. Like so many others, these officers simply waited too long while clinging to the hope that HOPI's financial circumstances could be reversed.

Robblee contends that the "encumbered funds" doctrine of *Slodov v. U.S.*, 436 US 238, 98 S Ct 1778, 56 L Ed 2d 251, 78-1 USTC (CCH) ¶ 9447 (1978), absolves him of liability. There the Court held that an officer assuming corporate duties after the tax obligations arose was not personally liable for unpaid taxes when he used later corporate income to

pay other creditors. In so holding, the Court ruled that withholding tax trust funds do not include after-acquired funds not directly traceable to the withheld taxes. The court reasoned that because the after-acquired funds were subject to liens that had priority over the tax liens, the corporate officer was not personally liable when he used those funds in accordance with the prior liens.

■    Aside from the fact that this holding has been misapplied and erroneously extended by some federal courts, Robblee ignores the Court's observation in *Slodov*, which states:

> "When the same individual or individuals who caused the delinquency in any tax quarter are also the 'responsible persons' at the time the Government's efforts to collect from the employer have failed, and it seeks recourse against the 'responsible employees' * * * there is no question that § 6672 is applicable to them." *Id.*, 436 US at 245-46.

There is no question plaintiffs were the responsible officers when the duty to withhold taxes arose. Also, the encumbered funds doctrine relates to the test of willfulness, an element of the federal statute but not of the Oregon statute.

■    HOPI's funds were encumbered before the company even began its operations. Under Robblee's theory, HOPI's officers could never be personally liable. This court must reject that position as contrary to the intent and language of ORS 316.167. Corporate officers in charge at the time withholding taxes are to be withheld and paid are personally liable and can not be excused by security agreements. Corporate officers may not continue operating a business, signing checks and preferring other creditors without becoming personally responsible if tax liabilities are not satisfied.

■    Maitland and Morkill argued they are not liable because they withdrew their check signing authority before the tax obligations arose. However, they cite no authority for their position and there is none. The statute imposes personal liability upon any officer or employee who is responsible to see that the corporate duty is performed. Check signing authority is just one indicia of that responsibility, a function often delegated to others. A responsible officer can not escape

responsibility when continuing in office by simply withdrawing his check signing authority.

> "Officers with otherwise unfettered authority simply would deprive themselves of permission to sign corporate checks in order to avoid the designation of 'responsible person.'" *Raba v. U.S.*, 977 F2d 941, 945, 93-1 USTC (CCH) ¶ 50,039 (5th Cir 1992).

The court must now consider which, if any, of the individuals before the court are liable under ORS 316.167.

Robblee does not seriously contest his personal liability. He and his wife constituted the board of directors, and he was the Chief Executive Officer. As a lawyer, he was knowledgeable of the laws and obligations of the corporation. He participated in the decisions, and there is evidence to indicate that he made the decisions not to pay the withholding taxes. The court finds Robblee personally liable.

■ Maitland was the president and a shareholder of the corporation. The bylaws describe his office as possessing "the usual executive powers pertaining to the office of President." The court finds the usual scope of a president's duties includes the duty to see that corporate withholding taxes are paid. Maitland participated in the corporate discussions and decisions. Because of his past experience, he attempted to escape liability by withdrawing his check signing authority. However, he took no other steps and continued in his office. There is no evidence he ever instructed Garman or others to pay the withholding taxes and no evidence his authority was restricted or withdrawn. Accordingly, the court finds Maitland personally liable.

Garman was the chief financial officer and a shareholder of the corporation. As chief financial officer one of his primary duties was to see that withholding taxes were paid. When he became aware that withholding taxes were due he was "uncomfortable" but did not insist upon their payment. He went along with the decision to try and keep CFC happy because he hoped negotiations would solve the corporation's problems. However, it is these kinds of hopes and expectations that entice officers to continue operating a business

until they cross the line of personal liability. The court finds Garman personally liable.

Morkill was the vice president in charge of marketing and also a shareholder of the company. The bylaws do not contain a description of a vice president's duties. The evidence indicated that Morkill did not have financial authority and was not in the loop with regard to the corporation's finances. Although he was in attendance at some of the meetings, he did not have the duty or authority to direct payment of bills or prefer one creditor over another. The court finds Morkill not personally liable.

The court's findings are consistent with the Department of Revenue's opinion and order in these same matters except with regard to the amount owing. Robblee's interest calculations indicate the balance owing as of December 31, 1995, was $58,845.68. The department has stipulated that if any of the officers are found liable, judgment may be entered in that amount. Accordingly, judgment will be entered sustaining the department's opinion and order in all respects except the amount due shall be $58,845.68 as of December 31, 1995. Costs to defendant.